## JOHN SLADE V. THE STATE.

### *No. 3053.    Decided February 28.*

1. **Practice—Continuance.**—The absent testimony set forth in defendant's application for a continuance being consistent with the theories of both the State and the defendant, was immaterial; therefore the refusal of the continuance does not constitute ground for a new trial.

2. **Same—Evidence—Threats—Conspiracy.**—In a prosecution for murder it is competent for the State to prove that the defendant threatened to kill other persons at the same time he threatened to kill the deceased. Such threats are admissible in behalf of the State, although not made by the defendant or in his presence, if made by a conspirator under circumstances which render the declarations of one conspirator evidence against his co-conspirators.

3. **Same—Confessions—Charge of the Court.**—"When the admission or confession of a party is introduced in evidence by the State, then the whole of such admission or confession is to be taken together, and the State is bound by them unless they are shown by the evidence to be untrue." The rule quoted, while correct, is not required to be given in a charge to the jury except in a case where the State relies for conviction alone upon the admissions or confessions of the accused and such admissions or confessions contain exculpatory or mitigating matters; in such case the rule quoted should be given in charge to the jury. In this case the State did not rely for conviction upon the admissions or confessions alone of the defendant, and it was not error to refuse to give such charge.

4. **Same—Abandonment of Conspiracy—Charge of the Court.**—There is no evidence tending to show that the defendant abandoned the common design to commit the murder, and he was present when the murder was committed. It was not error, therefore, to refuse to instruct the jury as to an abandonment by the defendant of the conspiracy.

5. **Same—Burden of Proof—Charge of the Court.**—An accused must be presumed to be innocent until his guilt is established by legal evidence, and in case of a reasonable doubt as to his guilt he is entitled to be acquitted. The burden of proof to show the truth of the charge against him is at all times on the State. See the opinion for a charge of the court which sufficiently and correctly instructed the jury as to the burden of proof.

APPEAL from Red River County.    Tried below before Hon. E. D. McClellan.

John Slade, the defendant, and E. Z. Roberts were indicted jointly
for the murder of Pleas White. They were tried separately, Slade
being first tried. He was convicted of murder in the second degree,
and his punishment assessed at confinement in the penitentiary for the
term of forty years. Roberts was subsequently tried at the same term of
the court, convicted of murder in the first degree, and the punishment
assessed at confinement in the penitentiary for life. Both defendants
appealed to the Court of Appeals, and in the Roberts case the judg-
ment of conviction was affirmed, but by direction of the court that case is
not reported, as it involved no questions not determined in this case.

The evidence in this case is largely circumstantial, and quite volu-
minous. It will be summarized, stating only the material portions of it.

On the evening of September 18, 1889, in Red River County, Texas,
Pleas White was shot and killed. When killed he was traveling on
the road leading from Walker Station to his residence, at a point on
said road about two miles from his home, and about seventy-five yards
east of a bridge on Young's Creek. He had been to Walker Station
and was returning home. His trip to Walker Station was to take his
brother Isaac there, who was returning to his home in Arkansas.
Deceased and his brother went to the station on horseback, and when
returning home deceased was horseback and leading the horse which
his brother rode to the station. Deceased rode his own horse, and his
brother rode their brother Jordan White's horse. Deceased had with
him at the time he was killed a double-barrel shotgun which his brother
Jordan had delivered to him to take when leaving to go to the station.

The place of the killing was described by several witnesses without
material variation. It was in or near a creek bottom, where there was
heavy timber but not much underbrush. The road at the point where
the dead body was found was about thirty feet wide. The usually trav-
eled portion of the road at that point was about the center, or perhaps
on the side farthest from the dead body. Near the dead body was a
log, some two or two and a half feet in diameter, resting upon the
ground nearly parallel with the road, and not far from the end of this
log, next to the dead body, was an ash tree some eighteen inches in
diameter, and close by a small tree or sapling. The log and these trees
could have served the purpose of a screen or ambush for a person lying
in wait for another who might travel the road. At the bridge, some
seventy-five yards from the dead body, were also some logs and drift
which would have afforded a hiding place, and also on the opposite side
of the road was a deep ravine or gully near the road, which would have
been a good hiding place, commanding a view of the road.

The dead body was found near the log and ash tree and the sapling,
in or near the edge of the road, and not on the portion of the road
usually traveled, but some sixteen feet therefrom. The ground where
the body lay was a little lower than where the log lay. A double-

barrel shotgun was found on the ground about twelve feet from the body.    Also a small sack of peas was found on the ground very nearly in the middle of the road.    The muzzle of the gun pointed toward the dead body.    There is some conflict in the testimony as to whether or not the gun was cocked.    Witnesses for the defendant, who took the gun from the ground, testified that one barrel was cocked.    This was the gun which Jordan White gave to deceased to take with him on his trip to Walker Station.

The dead body when found was lying upon its back with one foot drawn up.    The gunshot wound which caused the death was located a little behind the center of the left side.    The wound was made by No. 1 squirrel shot, the entire load entering the body together.    The range of the shot was backward and downward at an angle of about thirty degrees.    The shot broke the backbone and was found lodged there. The clothes at the entrance of the shot were powder-burned and set on fire.

Defendant Slade is a nephew of his co-defendant, E. Z. Roberts, and at the time of the killing was an unmarried man, and lived with said Roberts.    Said Roberts' wife was the sister of deceased.

The State proved by Mrs. Rebecca Ewing, who lived near E. Z. Roberts, that about 3 o'clock p. m. of the day deceased was killed she met Roberts in the road near his house.    He asked her if she had seen Pleas or Jordan White.    She told him she had not.    He said he had heard they had gone to Walker Station; that he had gone there to look for them, but had not found them; that he and they had had a row or difficulty, and he intended to see them and settle it before sundown. He had a double-barrel shotgun.    John Slade at that time was not in the main road, but was coming into it by a little by-way which led from Roberts' house.    Roberts called to him to hold up, and went to him, and they went off together in the direction of Walker Station. At Mrs. Roberts' request, she went to Roberts' house and remained there the balance of the afternoon.    She did not see Roberts any more that evening, but Slade came back to Roberts' house about one hour and a half before sundown.    He came from toward Walker Station, riding very fast on Jordan White's horse.    He rode up to the gate, got down and led the horse in at the gate, and told Mrs. Roberts that his uncle Zeke, meaning E. Z. Roberts, had killed Pleas White.    He had blood on his hands and arm, and said that he had dragged Pleas White out of the road.    He went to the wash-pan on the porch and washed his hands, and then went into the house and changed shirts.    He left Jordan White's horse there with the instructions to send it to its owner.    He got on Roberts' mule and rode off, saying he was going to take the mule to his uncle Zeke, who he said was at Dave Roberts', some ten miles distant.    When Roberts and Slade left together, going in the direction of Walker Station, they were walking.    Early that

morning Roberts had sent to witness' house to borrow a gun, but did not get it, as there was none on her place.

The State proved by the widow of deceased that the horse which deceased rode from home on the day he was killed was returned to her on the next Saturday after the killing by her brother Jim Hall, who resided at Walker Station; that the saddle which her husband used on that day had never been returned, and she had never seen nor heard of it after the day of her husband's death. She knew of no difficulty or hard feeling between her husband and the defendants.

The State proved by Mrs. Mary Fleming that on the Saturday before the killing (the killing occurred on Wednesday) Roberts and Slade were at her house. Roberts went up to the house, but Slade remained at the gate, some ten or fifteen feet distant. Roberts spoke to her something about the Whites interfering in regard to having his wife sent to the asylum. Said that he intended to kill Jordan White or any of his brothers that crossed his path, and that he would not give them that much show (measuring on his finger about one inch). Said they wanted to send his wife to the asylum, but that she was not crazy enough for that, and that they were always bothering with his family affairs, and it had to be stopped. He talked loud enough for Slade to have heard him, but a portion of the time during the conversation Slade and Wright were talking together at the gate. Late in the evening on the day of the killing Mrs. E. Z. Roberts took Jordan White's horse to witness' house, and requested witness to take the horse to Jordan White's, which she did.

The State proved by Jesse Fleming that about 3 o'clock p. m. on the day of the killing Roberts and Slade went into a field where he was picking cotton. Roberts was riding a mare and Slade a mule bareback. Roberts had a double-barrel gun and Slade a pistol. Roberts asked if witness had seen Jordan White, or any of the Whites. Witness answered he had not. Slade asked if witness had seen Billy Groves. Witness answered no. Slade then asked if the Misses White were picking cotton in the field, and witness told him he did not know. They then left, going back the way they had come. They did not say what they wanted with any of the parties they inquired about. Witness thought they were drinking. Roberts and Jordan White each cultivated portions of the field that witness was picking cotton in.

Alvin Glosson, a witness for the State, saw Slade and Roberts early in the morning of the day of the killing. They overtook him on the road leading from Roberts' house to Walker Station. Slade had a pistol belted on him and was riding a mule. Roberts was riding a horse. They said they were going to Walker Station to get some whisky, and asked witness to go with them, which invitation he declined. Roberts left Slade and witness went off on a by-road. Smith lived about one hundred yards from the road they were on. Witness did not know

whether or not Roberts went to Smith's and got a gun. After Roberts left, Slade said to witness he did not like Jordan White's ordering him out of his house the night before.

Other evidence adduced on the trial showed that the gun with which Roberts killed the deceased was one he borrowed from Smith on the morning of the killing.

On the night before the killing a family gathering for the purpose of singing had taken place at Jordan White's house. Slade went to the singing, accompanying a young lady and E. Z. Roberts' young daughter. Jordan White ordered him to leave the place. When leaving he said to Jordan White, "I'll see you later," or, "I'll see you to-morrow." Roberts' daughter left with him, but the young lady did not leave. There is some testimony to the effect that one of the Misses White had invited Slade to the singing, but she testified to the contrary. Jordan White testified that Slade had not been invited, and was not welcome at his house.

Jordan White, brother of deceased, a witness for the State, testified about the difficulty between Slade and himself at the family gathering on the night before the killing. The last time he saw deceased alive was on the day he was killed, about 1.30 p. m. Deceased was then at witness' house, and went from there to Walker Station with their brother Isaac, the latter riding witness' horse and the former his own horse. Deceased was to bring back witness' horse, their brother Isaac intending to take the train at the station for his home in Arkansas. Witness intended going with them to the station, but in consequence of information received by him that day from Pat Sherry in regard to remarks made by Roberts and Slade, he concluded not to go, and he gave deceased a gun to take with him on the trip, which was the same gun found near the dead body of deceased. Witness had borrowed the gun that morning, thinking he might need it in view of Slade's remarks to him on the night before. Witness received information of the killing about a quarter of an hour before sundown on that day, from Miss Mary Fleming, when she brought his horse home. Witness then went to the place of the killing, and he gave a description of the place, the position of the dead body, etc., substantially as hereinbefore stated.

Pat Sherry, a witness for the State, testified in substance that on the day of the killing, about 1 o'clock p. m., Roberts and Slade were at his house. Roberts was riding a mare, and had a double-barrel shotgun. Slade was riding a mule bare-back, and had a pistol. Slade called witness out of the house and told him he wanted to borrow some money for Roberts; that Roberts had to leave the country that evening. Witness told Slade he had no money to spare. At the time of their conversation Roberts and Van Hoos were some fifty or seventy-five yards distant, talking together. Slade left witness and went to where Roberts and Van Hoos were, and Slade and Van Hoos then went into witness'

stable, and witness then heard a pistol fired in or near the stable. Roberts and Slade both seemed to be drinking. Witness immediately went to Jordan White's, a distance of about one-half a mile, where he found Jordan, Pleas, and Isaac White, and he told Jordan White that Roberts and Slade might do him some harm.

J. A. Van Hoos, a witness for the State, testified substantially as did the last witness about Roberts' and Slade's visit to Sherry's. While Slade and Sherry were conversing at the house witness was out at the gate talking with Roberts. On the day before Roberts' wife had been tried on a complaint made against her by Roberts, charging that she was insane, and witness had become surety upon a bond to keep her from being confined in jail. In the conversation at the gate Roberts stated to witness that he wanted witness to give up Mrs. Roberts on the bond and let her go to jail. He told witness he was going to kill Pleas White, Jordan White, Tom Fowler, and Willie Groves that evening, and then leave the country. Slade went up to where witness and Roberts were talking, and said that Jordan White had ordered him out of his house last night, and that Pleas White had offered to fight him, and he intended to kill Jordan White, Pleas White, Willie Groves, and Tom Fowler before night. Witness tried to reason with Slade, but he said he didn't want any advice. While Slade was talking he pulled out his pistol and told witness that was what he had to do the work with. The pistol was pointed toward witness, and witness put his hand on it and pushed it down, when it was discharged, the ball striking the ground near witness' feet. After Roberts and Slade left witness saw them stop and dismount, and they were apparently reloading Slade's pistol. Witness stated that both of them were drunk.

Joel Slayton, a witness for the State, was the first person to find the deceased. He was traveling on the road where the killing occurred. Before witness discovered the body of deceased, a man whom witness took to be Roberts, riding a mule that witness took to be one owned by Roberts, came into the road about seventy-five yards ahead of witness, riding rapidly. The man rode on in advance of witness across the bridge on the creek, and beyond the bridge witness noticed that the mule shied. Witness did not see the man then for a few moments, as there was brush intervening. He heard the man cursing; supposed he was cursing the mule. He again came in sight of the man, saw him mount the mule, lay whip to the animal, and ride rapidly away in the direction of Walker Station. Witness went on to where the man had stopped, and there discovered the body of the deceased. Deceased was breathing his last when witness reached him. Witness could not state positively that the man he saw riding the mule was Roberts. This witness described the place of the killing and what he observed there, his statements corresponding substantially with those of other witnesses, except

that he stated that he did not think the gun lying near deceased was cocked, but did not examine it particularly.

Bart Duty testified, for the State, that about the middle of the evening of the day of the killing he was on the road leading from Sherry's gin to Pleas White's residence; that he was about one-half or three-fourths of a mile from Sherry's gin. Roberts and Slade came into the road from the woods, Roberts riding a horse and carrying a gun, and Slade riding a mule. They went toward Sherry's gin in a lope; one of them whooped as they rode off. There were some tree tops out not far from the road, in the direction from which they came into the road, and there was a place there where horses appeared to have been hitched, and some one appeared to have been down on the ground. The road was public, and deceased, when the weather was bad, hauled cotton over it to Sherry's gin, but the weather was not then bad. Witness stated that there was nothing unusual in the conduct of Roberts and Slade on that occasion, and that they rode off in the direction of their home.

Mordecai Fleming testified, for the State, that on the evening of the killing he was at Walker Station and saw deceased there. As witness went home from Walker Station he met Slade between the station and the place of the killing. Slade was riding Roberts' mule in a lope. He checked up and asked witness if he had seen Roberts. Witness answered "No; why?" He replied that Roberts had killed Pleas White, and he suggested that witness go after Wortham, a deputy sheriff, and something was said about a doctor. Witness went back to the station with Slade, and on the way Slade told him that Roberts and himself were in the bottom hunting when they saw Pleas White coming down the road; that Roberts said, "There comes Pleas White; I want to have a talk with him." Whereupon Slade stated to Roberts, "You do not want to talk with him." That when White rode up he advanced on Roberts, when Roberts shot him in the breast with a whole load of buckshot; that before shooting Roberts told White to stop, but the latter continued to advance.

Mrs. M. E. Roberts, wife of E. Z. Roberts, testified for the defendant. She was at home on the day of the killing. Mrs. Ewing was at her house that evening. On the morning of that day her husband and Slade went to Walker Station and returned home about 11 o'clock a. m. They rode a horse and a mule to the station. They left home again after dinner, about 1 o'clock p. m., on foot, going through the field, they said to hunt a cow. When they left in the morning to go to Walker Station they had no gun, but when they returned from that trip my husband had a gun which he had borrowed from Bob Smith. When they left after dinner they carried the gun with them. They came back from the cow hunt about two hours by sun, and after they had rested awhile witness asked her husband to go kill a squirrel for

her sick baby. He took the gun and started and Slade followed after
him, and it was then that her husband met Mrs. Ewing in the road as
testified about by Mrs. Ewing. She saw her husband no more that
evening. About one hour after they left Slade returned to the house
riding very fast. He was riding Jordan White's horse and saddle.
He said Roberts had shot Pleas White; said that Pleas was out there
dead; said deceased was running on Roberts when he was shot; that
Roberts and himself were hunting squirrels near the road in the creek
bottom when they saw White, who came up and got down off his
horse, turned both his horses loose, and started on Roberts with his gun,
saying something he (Slade) did not understand; that Roberts told
White to get on his horse and go on home; that he (Slade) begged
White to go on and let Roberts alone; that White pursued Roberts,
who retreated behind an ash tree, and then shot White. Slade said
nothing about the kind of shot or location of the wound. Said he
raised White up and asked him if he was hurt, and White answered
"Yes, I'm killed." Witness stated Slade told all this very quick;
that he did not wash his hands or change his shirt while there; did not
go on the gallery. He got the mule, saddled it, and left, saying he
would go by Walker Station and get a doctor. He requested witness
to take Jordan White's horse and saddle home.

Dave Roberts, a brother of E. Z. Roberts, testified, for defendant,
that he lived about ten miles from E. Z. Roberts. E. Z. Roberts went
to his house about one hour before sundown on the evening of the kill-
ing. He was riding Pleas White's horse and saddle. He stated to
witness that he had shot Pleas White; that he and Slade were squirrel
hunting in Young's Creek bottom, and when they came to the road
White rode up and said some angry words to him; that he told White
to go on, but White got off his horse and advanced on him with his gun;
that he (Roberts) retreated behind an ash tree, and White continuing
to advance on him, he shot him; that White got very close to him
before he fired. He said also that Slade begged White to go on and
have no difficulty. On cross-examination this witness stated that
Roberts told him that White was following him around a tree, and
he (Roberts) threw his gun around the tree and shot him. Slade went
to witness' house on the same evening, arriving there between sun-
down and dark. He told witness that Roberts and himself both tried
to get White to go on, but that White got off his horse and kept
advancing on Roberts with his gun; that Roberts retreated behind a
tree, and White continued to advance upon him when Roberts shot
him. Slade remained that night at witness' house. Roberts went to
Whiteman's and staid all night. Whiteman was a justice of the peace.
On the next day Roberts and Slade surrendered to the sheriff, and on
that day witness sent deceased's horse home, but did not send the sad-
dle, as Roberts was still using it. The saddle was afterward left at

witness' house, where it remained for several days, and was finally delivered by him to Hall, at Walker Station, Hall being a brother-in-law of deceased. It was an old saddle, and witness stated that it had no blood upon it, and there were no bullet holes in it. It does not clearly appear from the evidence what became of the saddle.

John Lewis testified, for defendant, that deceased and himself married cousins; that for some time prior to the killing deceased had been mad with E. Z. Roberts, had talked very harshly about him and threatened to kill him, always showing ill feeling toward him, etc.

Jeff Davis testified, for defendant, that in 1882 E. Z. Roberts married the sister of deceased. The marriage made deceased very mad, and on the next day after the marriage deceased was looking for Roberts, saying that he would kill him—that it would be no harm to kill a d—n dog. Witness persuaded him to let the matter drop. In August, before the killing, Roberts told witness he was not going to bother deceased. A few minutes afterward deceased said to witness that if he (deceased) could not shut up Roberts' mouth one way, he would in another way. At the time Roberts was talking to witness Slade was present, and remarked that Roberts had put up with a great deal from White.

John Slade, the defendant, testified in his own behalf, and stated in substance about the same as Mrs. E. Z. Roberts did as to the movements of Roberts and himself on the day of the killing. He stated about the same as Sherry and Van Hoos as to what occurred at Sherry's, except that he positively denied that he made the threats testified about by the witness Van Hoos, or any threats whatever. He denied washing his hands or changing shirts at Roberts', as testified about by Mrs. Ewing. Testifying as to the killing, he said: "As I stepped out into the road on the south side I saw the deceased coming from toward Walker Station on horseback, leading another saddled horse on his right, and the opposite side from us. I spoke to him and he spoke to me. He was riding on the beaten side of the road from us, and as soon as we noticed each other he turned his horses from the regular traveled portion of the road and rode out to where Roberts and I were, and as he approached us, I being some ten or more feet ahead, he made some kind of a harsh remark in reply to a salutation from Roberts, and having rode up close, within fifteen or twenty feet, commenced getting down off his horse, with his gun, which he had been carrying across his lap, cocked. Roberts had said nothing to provoke deceased, but I could tell from his flushed and excited appearance that he was mad, and I said, 'Go on; this is no place for a fuss or row.' Roberts also said, 'Don't get down here,' or words to that effect; 'we can't afford to have a fuss; you have a small family, and so have I; go on and let me alone, and I'll not bother you,' but the deceased got down, with his gun cocked in his hands and in a partially raised attitude, and just as

he was turning to advance on Roberts the latter, who had stepped back behind a medium sized tree, threw his gun around the same and fired. The deceased dropped his gun and, staggering forward in the direction of Roberts, fell. I ran to him, and, raising him up, asked if he was badly hurt, and he said 'yes.' He then asked me to turn him over, which I did. We then each took a horse," etc. He stated that he, and not Roberts, was the person on the mule who stopped at the dead body, as testified about by the witness Slayton; that it was he who was going from Roberts' to Walker Station; that when he stopped there White was not quite dead; that he got down off his mule and went to White and told him he would go for a doctor, and White answered, "Well." Defendant gave a detailed account of the occurrences of that day, and, except in a few particulars, his statements accorded substantially with those made by other witnesses. He stated on cross-examination as follows: "White did not advance a step after he alighted from his horse when Roberts shot him. He had just alighted about the edge of the road, and was in the act of turning around, with his gun in both hands, when he was shot. He was partially turned around at the time, and was standing straight up, I think."

*Sims & Wright, S. W. Harman* and *L. M. Brooks,* for appellant.—1. The court erred in overruling defendant's application for a continuance. This being a purely circumstantial case, all the evidence throwing light upon the killing became material and of vital importance. Brooks v. State, 26 Texas Ct. App., 87; Landers v. State, 35 Texas Rep., 359; Cooper v. State, 19 Texas Rep., 449; Rumbo v. State, 28 Texas Ct. App., 30; Fowler v. State, 25 Texas Ct. App., 27; McCline v. State, Id., 25 Texas Ct. App., 247; Maines v. State, 26 Texas Ct. App., 14.

2. The court erred in admitting the testimony of Van Hoos and Mrs. Ewing as to threats made on the day of the killing by defendant and Roberts. Barnes v. State, 28 Texas Ct. App., 29; Willson's Crim. Stats., sec. 2344; Cohea v. State, 11 Texas Ct. App., 153; Armisted v. State, 22 Texas Ct. App., 57; Anarchists' Case, 12 N. E. Rep., 866; S. C., 122 Ill., 1.

3. The court erred in refusing to give special charge requested by defendant, as to admissions or confessions. Pharr v. State, 7 Texas Ct. App., 472; Jones v. State, *ante,* 20.

4. The court erred in refusing to give special charge No. 3 requested by defendant, as to an abandonment of the conspiracy or design to kill. Willson's Crim. Stats., art. 74, secs. 142–147 to 155; Phillips v. State, 26 Texas Ct. App., 228; Knowles v. State, 27 Texas Ct. App.,503.

5. The court erred in refusing to give special charge No. 4 requested by defendant, as to the burden of proof. Phillips v. State, 26 Texas Ct. App., 228; Black v. State, 1 Texas Ct. App., 368; Templeton v.

State, 5 Texas Ct. App., 398; Shafer v. State, 7 Texas Ct. App., 239; Ake v. State, 6 Texas Ct. App., 398; King v. State, 9 Texas Ct. App., 515; Bishop on Crim. Prac., 2 ed., 1048–1056–1058; 1 Greenl. Ev., 13 ed., sec. 181 and note.

*R. H. Harrison,* Assistant Attorney-General, for the State.

HURT, JUDGE.—Slade and Roberts were jointly indicted for the murder of Pleas White. A severance was had, and Slade was placed on trial, which resulted in a conviction for murder of the second degree, his punishment being fixed at confinement in the penitentiary for forty years. From this judgment Slade appeals and assigns numerous errors.

First assignment: "The court erred in overruling the motion for continuance." The evidence desired from Mrs. Ann Roberts was "that she saw defendant when he arrived at Dave Roberts', and that there was no blood upon his shirt, and that Slade had changed his shirt at Dave Roberts' house." This is consistent with the theories of the State and of appellant, the State contending that the appellant changed his shirt at E. Z. Roberts' house; and if this be so, there was no blood on appellant's shirt when he reached Dave Roberts'.

Second: That there was error in admitting the testimony of Mrs. Ewing and J. A. Van Hoos. Van Hoos swore that appellant, on the day of the homicide, threatened to kill Jordan White, Billy Groves, and Tom Fowler. The objection being to the threats to kill other persons than deceased, viz., Jordan White, Groves and Fowler, let us suppose that appellant and Roberts intended to kill all of those persons, would the State not have the right to show this? Suppose, after such threats had been made, the appellant or Roberts had attempted to kill Jordan White, or Groves, or Fowler. Would not this be cogent evidence to show that the threats to kill deceased, Pleas White, were serious and not idle? The killing of all these persons being within the scope of the conspiracy, the State had the right to show the fact. Nor can appellant complain because this evidence may tend to establish another offense. Mrs. Ewing swore that Roberts made like threats to her. This was after the threats were made to Van Hoos. The threats to Mrs. Ewing were made in the absence of appellant. Concede these facts to be true, the threats were admissible, though made in the absence of Slade, because a conspiracy to kill deceased had very clearly been proved, not only by the threats to Van Hoos, but by other circumstances tending strongly to show such conspiracy.

Fourth assignment: "There was error in refusing to give special charge No. 4." Appellant requested the court to charge: "When the admission or confession of a party is introduced in evidence by the State, then the whole of such admission or confession is to be taken together, and the State is bound by them, unless they are shown by the evidence

to be untrue; and unless the State has shown the statements of defendant as to how the killing took place to be untrue, you should acquit him." This is an excerpt from the opinion in Pharr v. The State, 7 Texas Court of Appeals, 472. In the Pharr case the trial court had submitted to the jury two charges relating to the confessions or statements of the accused, the last being calculated to neutralize the first; the first being correct and the last wrong. The charge rejected in this case is in the language of the correct one in Pharr's case. Now, it is not decided in the Pharr case that, though correct, such a charge must always be given, when requested, in every case in which the State introduces in evidence the admissions of the accused. This question was not before the court in the Pharr case. Under what circumstances must such a charge be given? This question is answered in Jones v. The State, *ante*, p. 20. When the State relies for conviction alone upon the admissions and confessions of the accused, and such confessions or admissions contain exculpating or mitigating matters, such a charge should be given. In this case the State did not rely upon confessions or admissions alone for conviction. These were introduced mainly for the purpose of impeaching the accused, who testified in the case. There was a large mass of evidence adduced by the State in rebuttal of these confessions and admissions.

Fifth assignment: "The court erred in refusing to give a special charge as follows: 'You are instructed that should you find from the testimony, and so believe, that prior to the killing they had abandoned such formed design to kill the deceased, and that the deceased was afterward killed by the said E. Z. Roberts, and the defendant did no act at the time aiding, encouraging, or abetting the commission of the offense, he should only be held liable (if guilty at all) as an accomplice, and you can not find him guilty of that offense under this bill of indictment.'" There is no evidence of an abandonment of the design to kill deceased. Again, if appellant agreed to kill deceased he certainly was a principal, because it is absolutely certain that he was present at the homicide.

Sixth assignment: "The court erred in refusing to give a special charge as follows: 'Upon the question of proof you are charged that the burden of proof never shifts from the State to the defendant, but is upon the State throughout.'" In support of this assignment we are cited to quite a number of cases, but counsel for appellant rely mainly upon the opinion of this court in Black v. The State, 1 Texas Court of Appeals, 368. In that case the following charge was requested and refused:

"1. The accused must be presumed to be innocent until his guilt is established by legal evidence, and in case of a reasonable doubt as to his guilt he is entitled to be acquitted.

"2. The indictment in this case charges that Jeff Black was present, aiding and assisting, encouraging by his acts and words, in the killing of Green Butler.

" 3. In this case the burden of proof to show the truth of the charge is at all times on the State.

" 4. If then the jury believe from the evidence that there is a reasonable doubt, arising out of the evidence, as to the presence of the accused, Jeff Black, at the time of the commission of the murder, then you should acquit him."

The contention of counsel for appellant in this case is, that as the proof shows with absolute certainty that Roberts killed deceased, and that Slade was present under circumstances very strongly showing his guilt as a principal, the jury might hold the appellant to the burden of proving facts of justification, and hence the requested charge that the burden of proof to show the truth of the charge is at all times on the State.

This is an elementary principle, and is vital to the rights of the accused, and if the charge of the court in this case was so framed as to permit the jury to cast upon the defendant the burden of proving self-defense, or was so worded as to relieve the State of the burden upon the whole case, then there was error in refusing the requested charge.

By reference to the Black case it will be seen that the trial court in that case failed to instruct the jury that the accused was presumed to be innocent until his guilt is established by legal evidence, and in case of reasonable doubt as to his guilt he would be entitled to an acquittal. The trial court in that case did charge that "if the jury are not satisfied from the evidence that Green Butler was shot and killed by Andrew J. Walker, and that defendant, Jeff Black, was present at the time of the killing, aiding the said Walker by his acts, or encouraging him by his words, they will find him not guilty. If the jury entertain a reasonable and well founded doubt of the guilt of the defendant, arising out of the evidence of the case, they will find him not guilty." In the case we are new considering the court did instruct the jury that " the defendant is presumed to be innocent until his guilt is established by legal evidence, and if you have a reasonable doubt of his guilt you will find him not guilty." The court further charged that " the facts and circumstances relied on, and which are necessary to establish his guilt, must be proved beyond a reasonable doubt; they must be consistent with each other; must be inconsistent with any other reasonable hypothesis than that of defendant's guilt; and they must satisfy the minds of the jury beyond a reasonable doubt that the defendant is guilty of the offense with which he is charged." Under such instructions is it at all probable that the jury would have understood that the burden of proving anything whatever was upon the defendant? Would there be any doubt that the burden was upon the State to establish not only the killing, but that the homicide was murder? We think not.

We have carefully examined the other assignments of error. None of them are well taken when considered with reference to the charge as a whole and in the light of the evidence in the case.

*Affirmed.*

Davidson, J., being disqualified, did not sit in this case.